# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI-DADE DIVISION

### CASE NO.:

SCOTLYNN USA DIVISION, INC.,

      **Plaintiff,**

**vs.**

GO HUB.IO HOLDINGS, CORP.
fka GO HUB GROUP HOLDING,
CORP.; LOGISTICS HUB
GROUP, INC.; INTERMODAL
REFRIGERATED SERVICES,
INC. dba GO INTERMODAL;
FREIGHT HUB, CORP. dba
DRAY HUB; LTL HUB, CORP.;
FTL HUB, INC.; ASSETCO
FREIGHT BROKERS, INC. dba
DRAY HUB; LUIS D. LOPEZ III;
JEFF ARAGUREN aka JEFF
ARANGUREN aka JEFF
BANKERSON aka JEFF
BRIDGEWATER; NATALI
REINER; MARTHA VARGAS;
ADRIAN DUNNING aka ADRIAN
CUEST aka ADRIAN CUESTA;
EDUARDO ALEMAN aka EDDIE
ALEMAN aka ED HANKERSON,

      **Defendants.**

## <u>COMPLAINT</u>

For its Complaint, Plaintiff Scotlynn USA Division, Inc. states:

## Jurisdiction and Venue

1.     This Court has original jurisdiction over this action under 28 U.S.C. §1331 and §1337(a), as this action arises from the carriage of goods in interstate commerce, and 18 U.S.C. §1964.  28 U.S.C. §1367(a) vests this Court with supplemental jurisdiction over Plaintiff's other claims.

2.      Venue in this District is based on 28 U.S.C. §1391(b) and (d), as the causes of action set forth in this Complaint arose in Miami-Dade County, Florida, and 18 U.S.C. §1965.

## The Parties

3.     Plaintiff is Scotlynn USA Division, Inc. ("Scotlynn"), a Florida corporation with its principal place of business located at 9597 Gulf Research Lane, Fort Myers, Florida.  Scotlynn holds a property broker license MC-710411 issued by the Federal Motor Carrier Safety Administration ("FMCSA").

4.     Defendants are:

    a.     Go Hub.io Holdings, Corp. fka Go Hub Group Holding, Corp. ("Go Hub Group") is a Florida corporation with its principal place of business at 8005 NW 80th Street, Unit 1, Miami, Florida 33166. Go Hub Group Holding, Corp. wholly owns each of the Go Hub Group Entities (as defined below), and upon information and belief is owned and controlled by Defendant Luis D. Lopez, III.

    b.     Freight Hub, Corp. dba Dray Hub ("Freight Hub"), is a Florida corporation whose principal place of business is located at 8005 NW 80th Street, Unit 1, Miami, Florida 33166. Freight Hub holds DOT license number 3091519 and MC-71833 from the Federal Motor Carrier Safety

Administration ("FMCSA").

c.  Logistics Hub Group, Inc., ("Logistics Hub") a Texas corporation whose principal place of business is located at 15115 Park Row, Suite 350 PMB1046, Houston, TX 77084. Upon information and belief, Logistics Hub holds DOT license number 3524246 and MC-1170893 issued by FMCSA.

d.  LTL Hub, Corp. ("LTL Hub"), is a Florida corporation with its principal place of business located at 8005 NW 80th Street, Unit 1, Miami, Florida 33166. Upon information and belief, LTL Hub holds DOT license number 3245059 and MC-1021187 issued by FMCSA.

e.  FTL Hub, Inc. ("FTL Hub"), is a Florida corporation whose principal place of business is located at 8005 NW 80th Street, Unit 1, Miami, Florida 33166. Upon information and belief, FTL Hub holds DOT license number 3389014 and MC-1088894 issued by FMCSA

f.  Assetco Freight Brokers, Inc. dba Dray Hub ("Assetco Freight") is a Florida corporation whose principal place of business is located at 8005 NW 80th Street, Unit 1, Miami, Florida 33166.

g.  Intermodal Refrigerated Services, Inc. dba Go Intermodal ("Go Intermodal") is a Florida corporation with its principal place of business located at 8005 NW 80th Street, Unit 1, Miami, Florida 33166. Upon information and belief, Go Intermodal has been issued DOT license number 3682288 and MC-1281321 issued by FMCSA.

h.  Luis D. Lopez, III ("Luis Lopez") is an individual who resides in Miami-Dade County, Florida. Luis Lopez is the owner of Go Hub Group, which in turn wholly owns each of the following subsidiaries: Freight Hub, Go Hub Group, Logistics Hub, Team DGD, Truck Hub, WHSE Hub, LTL Hub, FTL Hub, Assetco Freight, Assetco Global, Hazmat Hub, and Go Intermodal, collectively hereinafter referred to as the "Go Hub Group Entities." Upon information and belief, Luis Lopez is the sole officer and shareholder and

serves as the sole officer of each of the subsidiaries.

i.  Jeff Araguren is an individual who resides in Miami-Dade County, Florida. Upon information and belief, Jeff Araguren uses the alias names of Jeff Aranguren, Jeff Bankerson and Jeff Bridgewater, is the Operations Manager of FTL Hub and LTL Hub, and has held himself out as the owner of Go Intermodal.

j.  Natali Reiner is an individual who upon information and belief resides in Miami-Dade County, Florida. Natali Reiner is the Accounts Receivable Collections Specialist for all the Go Hub Group Entities.

k.  Martha Vargas is an individual who upon information and belief resides in Miami-Dade County, Florida. Upon information and belief, Martha Vargas is the Controller for Go Hub Group and has held herself out as the owner of LTL Hub, Inc.

l.  Adrian Dunning is an individual who resides in Miami-Dade County, Florida. Upon information and belief, Adrian Dunning uses the alias names of Adrian Cuest and Adrian Cuesta. Upon information and belief, Adrian is an employee of one or more of the Go Hub Group Entities, and has held herself out as the Logistics Coordinator for LTL Hub, Inc.

m.  Eduardo Aleman is an individual who resides in Miami-Dade County, Florida. Upon information and belief, Ed Aleman uses the alias names of Eddie Aleman, Ed Ashcroft, and Ed Hankerson, and is a Full Truckload Specialist for the Go Hub Group Entities.

5.  Freight Hub is a fully owned subsidiary of Go Hub Group, and utilizes the registered fictitious name "Dray Hub"

6.  LTL Hub, FTL Hub and Assetco Freight each use the registered fictitious name "Freight Hub Group."

7.  LTL Hub, FTL Hub and Assetco Freight are each wholly owned

subsidiaries of Go Hub Group.

8.　　Freight Hub conducts business using the names DRAY Hub, and Freight Hub Group.

9.　　LTL Hub conducts business using the names LTL Hub, Go LTL Hub, and Freight Hub Group.

10.　　Assetco Freight conducts business using the names LTL Hub, FTL Hub, DRAY Hub, WHSE Hub, HAZMAT Hub, Freight Hub, DGD Transport, and Freight Hub Group.

11.　　Assetco Freight is the holder of the account at OceanBank, where payments to any of the Go Hub Group Entities are deposited.

### Background Facts

#### *Freight Hub/Luis Lopez's Initial Agreement with Scotlynn*

12.　　On December 23, 2019, Scotlynn and Freight Hub entered into the Property Broker/Carrier Agreement (the "Freight Hub Master Agreement"). Freight Hub contemporaneously submitted a Carrier Form, identifying its DOT number as 3091519 and its MC-071833.  The "Freight Hub Contract" is comprised of the Freight Hub Master Agreement and a Carrier Form. A copy of the Freight Hub Contract is attached as Exhibit 1.

13.　　In the Freight Hub Contract, Freight Hub represented to Scotlynn that its place of business is located at 8005 NW 80th Street, Unit 1, Miami, Florida 33166.

14.    On December 27, 2019, Freight Hub submitted an additional but separate Carrier Form to Scotlynn, representing that it uses the fictitious name Dray Hub, which operates from the same address as Freight Hub, and uses Freight Hub's DOT and MC numbers.  The initial Freight Hub Master Agreement referenced in ¶12 above, in conjunction with this Carrier Form make up the "Dray Hub Contract." A copy of the Dray Hub Contract is attached as Exhibit 2.

15.    On December 14, 2020, Scotlynn contracted with Freight Hub to carry nineteen pallets of White Claw hard seltzer from Cold Spring, Minnesota to Doral, Florida for $4,700.00. A copy of Rate Confirmation 0266050 is attached as Exhibit 3.

16.    The Freight Hub Contract prohibits Freight Hub from allowing any other carrier to transport the loads brokered to it by Scotlynn.

17.     Despite such prohibitions, and without Scotlynn's knowledge or consent, on December 15, 2020, FTL Hub picked up the load brokered to Freight Hub and signed the Bill of Lading[1] ("BOL"), acknowledging acceptance of the cargo in good condition.

18.    The Bill of Lading signed by FTL Hub contained conspicuous language that explicitly stated, "Protect from Freezing."  A copy of the White

---

[1] Sometimes referred to as a "BOL."

Claw Bill of Lading is attached as Exhibit 4.

19.     On Friday, December 18, 2020, FTL Hub delivered the White Claw to Doral, Florida.

20.     Soon after, the consignee notified Scotlynn that the White Claw arrived frozen, resulting in a complete loss.

21.     As a result of the freezing damage, Scotlynn's customer pursued a claim in the amount of $39,563.70 against it, representing the full value of the load of White Claw.

22.     On December 28, 2020, Natali Reiner, an "Accounts Receivable Collections Specialist" for Go Freight Hub, contacted Scotlynn stating that the invoice for the White Claw transportation was past due. In the ensuing exchange, Scotlynn notified Natali Reiner that the amounts payable to Freight Hub were being held because of the freezing claim:

> Your client froze $40k worth of White Claws on load 266050 that they ran at -10 for some reason. That amount of their payables will be held. I don't have any additional information for you at this time. Given the short week and amount of people out, it may be best to follow up next week for any more details regarding the claim.

23.     On December 29, 2020, at 8:36 a.m., Natali Reiner added Jeff Araguren and others "for assistance" with the claim.

24.     Jeff Araguren immediately emailed Scotlynn stating:

> If the load was frozen, why are our BOLs marked clean? We did not freeze any load,[sic] this was a dry load.

Furthermore, had the load been bad the BOL would have been marked received under protest at least. Also, where is the formal claim notice? Team, please file against Scotlynn bond, what they are doing is illegal. They cannot hold unrelated invoices for a bogus claim without any proof.

25.    Scotlynn replied:

Your driver admitted to running this load at -10. The product arrived frozen. I'm not going to venture into a pointless argument with you about this. You will be provided all of the documents once everything is received. What we're doing is not illegal, it's part of the contract you signed with us.

The reference to "the contract" refers to the Freight Hub Contract attached as Exhibit 1. Under ¶9 of the Freight Hub Master Agreement, Freight Hub agreed that it will be paid by Scotlynn only after the carrier furnishes proof of delivery and an invoice to Scotlynn, and after Scotlynn is paid by its customer. Freight Hub also agreed that payment owed by Scotlynn to it will be set-off for any actions taken by it that result in non-payment to Scotlynn, such as a carrier damage claim.

26.    Martha Vargas responded to Scotlynn:

We have CLEAN BOLs [sic] In [sic] addition, we have cargo insurance you should not be holding payment for an invalid claim that has not even been formally filed nor provided proof of any kind.

27.    On December 29, 2020, at 9:27 a.m., Scotlynn replied to Ms. Vargas:

Clean BOLs do not exonerate you from being claimed. All product goes through an inspection. If your cargo insurance pays the claim, any money they held will be released back to

you. I don't have any more information for you right now.
Given everything, paperwork is taking a little longer to
process. I will get everything over to you asap.

28.     After receiving the claim documents from its customer, Scotlynn

notified Freight Hub of the formal claim.

29.     On January 8, 2021, following unsuccessful attempts to recover

payment from Freight Hub for the loss, Scotlynn provided Freight Hub with

the written claim notice attached as Exhibit 5.

### *Luis Lopez, via LTL Hub, Contracts with Scotlynn for the Purpose of Holding Cargo Hostage to Secure Payment for Freight Hub*

30.     On January 7, 2021, Scotlynn entered into a Property

Broker/Carrier Agreement with LTL Hub (the "LTL Hub Master Agreement").

Contemporaneously, LTL Hub submitted a Carrier Form to Scotlynn

representing that it held DOT No. 3245059 and MC-1021187. The LTL Hub

Master Agreement in conjunction with the Carrier Form make up the "LTL

Hub Contract." A copy of the LTL Hub Contract is attached as Exhibit 6.

31.     Scotlynn did not know that LTL Hub was affiliated with Luis

Lopez or any of the Go Hub Group Entities. The paperwork submitted to

Scotlynn states Martha Vargas is the owner of LTL Hub.

32.     On January 7, 2021, the same day that the LTL Hub Contract was

signed, Scotlynn hired LTL Hub to transport two loads.

33.     The first load was 42,000 pounds of fresh pork ("Pork Load"), from

Eagle Grove, Iowa to Medley, Florida, in exchange for $5,200.00. A copy of the Carrier Confirmation 0275514 for the Pork Load is attached as Exhibit 7.

34.   The second load was 840 cases of eggs ("Egg Load") from North Manchester, Indiana to Houston, Texas, in exchange for $3,000.00. A copy of the Carrier Confirmation 0275663 reflecting the same is attached as Exhibit 8.

35.   Unbeknownst to Scotlynn, LTL Hub did not have federal authorization to transport the Pork Load or the Egg Loads, and unbeknownst to Scotlynn, LTL Hub never intended to transport these loads.

36.   Without Scotlynn's knowledge or consent, an entirely different entity named FTL Hub signed the Bills of Lading for the Pork and Egg Load, copies of which are attached as Exhibits 9 and 10.

37.   Luis Lopez is the sole shareholder, owner, director, officer, and president of each of the Go Hub Group Entities. Luis Lopez also controls, manages, and oversees the entities' day-to-day operations of each of the Go Hub Group Entities.

38.   On January 8, 2021 at 8:39 a.m., just hours after FTL Hub took possession of the Pork and Egg Loads, Luis Lopez responded to the email exchange that ended on December 29, 2020 relating to the Freight Hub Contract.

39.   Mr. Lopez's email states that he disagrees with Scotlynn's position

that the set-off for the frozen White Claw claim is permitted by the terms of the Freight Hub Contract, and states that if payment is not received by noon (in 3 hours and 21 minutes), both the Pork (0275514 ) and Egg (0275663) Loads will be unloaded at his warehouse, and cargo liens will be imposed.



**From:** Luis Lopez <Luis@gofreighthub.io>
**Sent:** Friday, January 8, 2021 8:39 AM
**To:** Scotlynn Claims <claims@scotlynn.com>; Martha Vargas <MVargas@gofreighthub.io>; Jeff Aranguren <inland1@goftlhub.io>; Natali Reiner <accounting@gofreighthub.io>; Luisa Hernandez <Inland4@goftlhub.io>
**Cc:** Hunter Pearson <jpearson@scotlynn.com>; Brad Carter <bcarter@scotlynn.com>; abridgwater@@scotlynn.com <abridgwater@@scotlynn.com>; Shared - USA Accounting <usaaccounting@scotlynn.com>
**Subject:** RE: Claim 266050 -

Please not I respectfully disagree, we have clean BOLS and we have had no mention of any formal claim for weeks. You cannot extort a carrier of their livelihood on completed loads, at this time your terms have been revoked and all open orders will be placed on hold until a wire for the full amount is paid. You have lost credit with us and are now on prepayment

Loads # 0275663 and 0275514 are on hold, if the issue is not resolved by 12 noon today we will offload the trailers in our warehouse and put cargo liens on the loads for non payment.

40.    The "issue" Luis Lopez is referring to is the following list of demands to Scotlynn:

a.    Scotlynn wire $5,800 for the freight services rendered by Freight Hub, notwithstanding the pending claim related to the White Claw; and

b.    Scotlynn wire an additional $8,200 as *pre-payment* for transportation of the Pork and Egg Loads despite the fact that Scotlynn's payment was not yet due under the terms of the LTL Hub Contract.

41.    Luis Lopez instructed Scotlynn to wire funds to the Ocean Bank account held by Assetco Freight and shared by the Go Hub Group Entities.

42.    Scotlynn objected to the demands made by Luis Lopez, stating that Freight Hub and LTL Hub are separate entities, and that its dealings with one

have nothing to do with the other.  Scotlynn also reminded Luis Lopez that it had a contractual right to set off payment to Freight Hub due to the frozen White Claw claim.

43.   Scotlynn was left with little choice other than to agree to Luis Lopez's demands. As far as Scotlynn knew, LTL Hub was in possession of cargo belonging to Scotlynn's customers. Refusing to pay the amounts demanded by Mr. Lopez would result in loss to the cargo and damage to Scotlynn's customer relationships.

44.   To mitigate such loss, at approximately 11:37 a.m. on January 8, 2021, Scotlynn conceded to these demands and told Luis Lopez that it would pay the outstanding invoices and file a claim. Scotlynn further stated that "For the loads that you are holding hostage we will need confirmation your drivers are at the deliveries before we can release Comchecks for those loads."

45.   At 11:39 a.m. Luis Lopez responded, "Ok agreed. We need payment to post so please do wire."

46.   The Carrier Confirmation for the Egg Load (Exhibit 8) required delivery between 5:30 a.m. and 11:00 a.m. on January 8, 2021.

47.   Luis Lopez did not notify Scotlynn that these loads would not be delivered until approximately 8:40 a.m. on January 8, 2021, leaving roughly two hours for Scotlynn to meet the ransom demand and for Luis Lopez to instruct the driver to deliver the cargo.

48.     At 11:54 a.m. on January 8, 2021, Eduardo Aleman, a purported representative of FTL Hub, emailed Scotlynn photos from outside of the receiver's facility.  The email stated, "Load # 0275663 – Team drivers pulling into site…"

49.     Scotlynn's executive vice-president responded stating: "Guys, we will need for [sic] confirmation from receiver that these hostage loads are being delivered in perfect order before submitting payment. Likely need clean bols [sic]."

50.     Jeff Araguren, who Luis Lopez copied on this email string, refused:

| | |
|---|---|
| From: | JEFF ARAGUREN <ftlhub1@ftlhub.io> |
| Sent: | Friday, January 8, 2021 12:03 PM |
| To: | Ryan Carter; Eddie Aleman; Luis Lopez; Kevin Kollker; Natali Reiner; Ashley Bridgwater; Scotlynn Claims; Martha Vargas; Jeff Aranquren; Luisa Hernandez; Katy Esquivel; Josh Prues |
| Cc: | Hunter Pearson; Brad Carter |
| Subject: | Re: Claim 266050 - |

Ryan,

That's a big negative. Neither of the two loads will be delivered unless full payment is made.

51.     At 12:30 p.m., on January 8, 2021, Scotlynn's Director of Operations responds and states:

> Luis, we agreed you would make delivery, you at least have to bump a dock so we can confirm the freight is in good order. The wire has already been initiated so we are holding up our end of the agreement.

52.     At 12:32 p.m., Luis Lopez replies, stating: "I told you on the phone that the driver will be there [sic] we will not back up to a door, we are not going

to allow the driver to be threatened by anyone."

53.     At 1:17 p.m. Scotlynn sends another email: "Kroger just called and said the drivers need to check back in, once that is done I will Comcheck you out on this load. Please advise ASAP."

54.     At 1:23 p.m. Adrian Dunning responded "[d] river is checking back in, They [sic] are advised not to unload until payment is received, Thank You!!"

55.     At 1:26 p.m. Scotlynn sought confirmation of impending delivery, stating "Ok, please let me know when they are back through the gate and we will issue a Comcheck."

56.     At 1:38 p.m. Adrian Dunning responded that the driver was checked in but would not deliver without payment: "Thay [sic] are checked in, Awaiting [sic] payment to continue with delivery".

57.     Scotlynn, left without a choice, wired $3,000.00 to satisfy the demands made by Luis Lopez and to ensure the delivery of the Egg Load. This transaction was relayed at 1:48 p.m. by Scotlynn, "Load# 0275663 - $3000 – Comcheck code: 236907092893423310"

58.     At 2:18 p.m., Scotlynn requested a copy of the Bill of Lading, stating "Adrian, can you send a copy of the BOLs when they are done unloading?"

59.     At 2:32 p.m., Jeff Araguren responded, after payment was made, indicating that the receiver would not allow delivery: "… They [the receiver]

are telling our driver that they need to check back in at 5am tomorrow morning".

60.    At 2:48 p.m., Scotlynn responded asking for delivery confirmation the following day: "Ok, please let us know when they are unloaded tomorrow."

61.    As a result of the directions given by Luis Lopez not to deliver the Egg Load until payment was received, the driver arrived at the facility after the delivery window closed and missed the scheduled delivery appointment. Scotlynn incurred a $200.00 penalty for late delivery of this load.

62.    The Carrier Confirmation for the Pork Load (Exhibit 7) required delivery time between 8:00 and 9:00 a.m. on January 11, 2021. Luis Lopez also demanded payment from Scotlynn in the amount of $5,200.00 for delivery of this load.

63.    In total, Scotlynn paid $14,000.00 to the Ocean Bank account held in the name of Assetco Freight, representing payment of $5,800 to Freight Hub, along with $8,200 to LTL Hub for the Egg Load ($3,000.00) and the Pork Load ($5,200.00).

### Logistics Hub/Luis Lopez Contracts with Scotlynn

64.    On September 1, 2021, Logistics Hub signed a Property Broker/Carrier Agreement (the "Logistics Hub Master Agreement") with Scotlynn. Contemporaneously, Logistics Hub submitted a Carrier Form to Scotlynn representing that it held DOT No. 3524246 and MC-1170893. The

Carrier Form in conjunction with the Logistics Hub Master Agreement make up the Logistics Hub Contract. See Exhibit 11.

65.     The Logistics Hub Contract represents to Scotlynn that Melissa Medri owns Logistics Hub, and that Ed Hankerson aka Eduardo Aleman is both a dispatcher and the contact person for claims.

66.     Logistics Hub did not disclose to Scotlynn that it was affiliated with Luis Lopez, or any of the Go Hub Group Entities.

67.     Between September 1 and September 14, 2021, Scotlynn hired Logistics Hub to transport 4 loads.

68.     When Logistics Hub sent invoices to Scotlynn for payment for these transportation services, each invoice revealed that FTL Hub, not Logistics Hub, transported these loads.

69.     FTL Hub transported these loads without Scotlynn's consent, and Scotlynn was unaware that Logistics Hub was affiliated with the Go Hub Group Entities.

70.     On Thursday, September 30, 2021, Natali Reiner contacted Scotlynn seeking payment of $21,921.00, the total for the four invoices.

71.     Realizing Logistic Hub's affiliation with Luis Lopez and the Go Hub Group Entities, Scotlynn informed Logistics Hub that its account was on hold because of the unpaid claim for the frozen White Claw.

72.     At 11:05 a.m. that morning, Natali Reiner added the email address

Ops3@GoLogisticsHub.io to this email thread, stating: "please[sic] advise urgently." She then states, "@Scott Wampler what load has a claim? Why have we not received any notice of this claim until now??"

73.    At 12:07 p.m. Ops3@GoLogisticsHub.io stated: "Scott, We did not haul any load with that commodity. This is not a valid claim."

74.    The author of emails sent from Ops3@GoLogisticsHub.io remains unknown.

75.    At 12:24 p.m. Scotlynn replied: "Freight Hub Corp who is affiliated with your company hauled the load 266050."

76.    Scotlynn exercised its contractual right to withhold payment for setoff of the balance from the White Claw claim. The White Claw claim totaled $39,653.70, and the balance withheld from Logistics Hub totaled $21,921.00.

77.    Logistics Hub denied the claim and continued to demand payment on the four invoices.

78.    Days later, on October 4, 2021, at 10:19 a.m., Scotlynn received an email from accounting@gofreighthub.io requesting payment for the four invoices that Scotlynn was withholding as setoff.

79.    At 2:18 p.m., Scotlynn replied seeking revised invoices with the carrier name changed to Logistics Hub Group on invoices 0393044 and 0394548:

We still require the following: 0393044 – invoice with

"Logistics Hub Group" listed as the carrier name [sic] 0394548 – invoice with "Logistics Hub Group" listed as the carrier name.

80.     At 2:21 p.m., Natali Reiner stated that revised invoices have been sent on multiple occasions and again requests payment.

81.     At 2:56 p.m., Scotlynn responded, stating:

We have the NOA and 2 of the 4 revised invoices…but I can't do anything with payment until the carrier name on the invoice matches the rate confirmation. The 2 loads below, are ones we're still waiting on.

82.     At 3:04 p.m., Natali Reiner replied that "[t]hey have already been sent [sic] Please see attached and provide payment status."

83.     Email communications ceased for nearly a month, until November 2, 2021. At 10:24 a.m. that morning, Natali Reiner sent an email stating: "Please provide proof of payment for past due balance [sic] Account is $21,921.00 overdue."

84.     At 2:24 p.m., Scotlynn instructed Natali Reiner to direct future inquiries to its counsel.

85.     At 2:39 p.m., Natali Reiner contacted Scotlynn's counsel stating: "Please urgently advise what is going [sic] we have not received any notice or payment for past due balance."

86.     At 2:54 p.m., Martha Vargas sent an email to Scotlynn's counsel also requesting payment.

87.     That same day, Logistics Hub filed a claim against Scotlynn's surety bond for $21,921.00, representing the total amount of the four unpaid invoices.

88.     At 5:58 p.m., counsel for Scotlynn responded:

> In accordance with the contracts between Scotlynn USA Division, Inc., Freight Hub, and LTL Hub, my client is setting off the amounts owed on these invoices from the attached claim that was submitted to Mr. Lopez back in January. As you can see, the truck froze a load of White Claw, and efforts to obtain a reefer download were ignored. Please be advised that Scotlynn is also disputing the claim that your company has filed against its brokers bond. Please direct future communications related to this matter to my office, along with the contact information for the attorneys who may be involved in representing the Freight Hub Group in this matter."

89.     The next morning, at 10:10 a.m. on November 3, 2021, a response was sent from the email address Escalation@gofreighthub.io stating:

From: Escalation <Escalation@gofreighthub.io>
Sent: Wednesday, November 3, 2021 10:10 AM
To: Katy Esquivel <kke@esquivel-law.com>
Cc: Martha Vargas <MVargas@gofreighthub.io>; Natali Reiner <accounting@gofreighthub.io>
Subject: FW: PAYMENT STATUS PAST DUE BALANCE

Just to be clear

Freight Hub Group is a broker is not a motor carrier, we manage multiple carriers we have nothing to with one specific carrier we are simply managing and collecting multiple carriers if you have a claim you can simply file a claim against the carriers insurance. But not paying another carrier just because we are managing that carrier is not acceptable and your bond will be revoked and filed against.

Luis Lopez is no longer with the company and we do not handle carrier claims, if you have had the carrier fill out the carrier packet then reach out the insurance and get the claim paid but we need open invoices paid for Logistics Hub which has no relationship.

We manage over 10 carriers so not sure what this issue is but you need to pay LOGISTICS HUB ASAP

90.     At 10:54 a.m., counsel for Scotlynn replied stating that Freight Hub breached the contractual agreement between the parties by double brokering, and that Freight Hub froze the White Claw and refused to cooperate

in investigating that claim.  The fact that when Scotlynn notified Freight Hub that it was withholding payment in accordance with the Freight Hub Contract, Luis Lopez instructed LTL Hub to enter into the LTL Hub Contract and then held the Egg and Pork Loads ransom in order to extort payment from Scotlynn was also noted.

91.    At 11:08 a.m., Escalation@gofreighthub.io responded:

**From:** Escalation <Escalation@gofreighthub.io>
**Sent:** Wednesday, November 3, 2021 11:08 AM
**To:** Katy Esquivel <kke@esquivel-law.com>
**Cc:** Martha Vargas <MVargas@gofreighthub.io>; Natali Reiner <accounting@gofreighthub.io>; Colleen M. Crosby <cmc@esquivel-law.com>
**Subject:** RE: PAYMENT STATUS PAST DUE BALANCE

See attached carrier contract for Logistics Hub, again nothing to do with Freight Hub so you have made false and defamatory accusastion against this carrier and not paid them and they did nothing wrong outside of using us as a collections and management firm

We will file a claim against the bond and you will lose.

We will also have to stop services with all other carriers in our network now due to your fraud and unethical practices

92.    At 12:56 p.m., counsel for Scotlynn responded stating that if the author of the escalation@gofreighthub.io emails were to identify themselves and their role with the company, she would discuss the matter further.

93.    At 1:01 p.m., Escalation@gofreighthub.io replied:

**From:** Escalation <Escalation@gofreighthub.io>
**Sent:** Wednesday, November 3, 2021 1:01 PM
**To:** Katy Esquivel <kke@esquivel-law.com>
**Cc:** Martha Vargas <MVargas@gofreighthub.io>; Natali Reiner <accounting@gofreighthub.io>; Colleen M. Crosby <cmc@esquivel-law.com>
**Subject:** RE: PAYMENT STATUS PAST DUE BALANCE

One has nothing to do with the other Luis Lopez is not the owner of Logistics Hub Group and your client is holding funds for a carrier who was not even operating at the time of LTL HUB and Freight Hub Corp issue

Your firm and client legally are in no position to hold these funds and if you have a claim against freight hub corp and ltl hub corp since January why don't you file a lawsuit its now 9 months later and have done nothing.

We are simply in the middle managing multiple carriers and you leaving us no choice but to action action because of your deceptive practices against a carrier that has nothing to do with something 9 months ago.

So if this is your position our next steps will not be favorable to your firm.

Will you be releasing these funds or not?

94.    The author of the emails sent from escalation@gofreighthub.io

would not identify himself.

### *Luis Lopez, via Go Intermodal, Contracts with Scotlynn For the Purpose of Holding Cargo Hostage to Secure Payment*

95.   The very next day, on November 3, 2021, Go Intermodal signed a Property Broker/Carrier Agreement ("Go Intermodal Master Agreement") with Scotlynn. This Master Agreement is identical to the one that is in the Freight Hub Contract, LTL Hub Contract, and the Logistics Hub Contract.

96.   Contemporaneously, Go Intermodal submitted a Carrier Form to Scotlynn representing that it held DOT no. 3682288 and MC-1281321. The Go Intermodal Master Agreement in conjunction with the Carrier Form make up the "Go Intermodal Contract." A copy of the Go Intermodal Contract is attached as Exhibit 12.

97.   At the time, Scotlynn was unaware of Go Intermodal's affiliation with Logistics Hub, Luis Lopez, or any of the Go Hub Group Entities.

98.   The paperwork that Go Intermodal submitted to Scotlynn identified Jeff Bankerson aka Jeff Araguren as the owner of Go Intermodal, and Adrian Dunning as the dispatcher and contact person for claims.

99.   Scotlynn then hired Go Intermodal to transport the following 3 loads:

  a.   On November 3, 2021, Scotlynn hired Go Intermodal to transport a load of dry grocery items (the "Grocery Load") with two delivery stops. The first delivery was scheduled for November 3 between 8:00 a.m. and 3:00 p.m. The second

delivery stop was on November 5, with an arrival time of 2:00 a.m. Rate Confirmation 0415533 for the Grocery Load is attached as Exhibit 13.

b.  On November 4, 2021, Scotlynn hired Go Intermodal to transport a load of cranberries (the "Cranberry Load") with two delivery stops. The first delivery stop was scheduled for November 4th at 2:00 p.m. The second stop was scheduled for November 10th between 8:00 a.m. and 5:00 p.m. Rate Confirmation 0420921 for the Cranberry Load is attached as Exhibit 14.

c.  On November 4, 2021, Scotlynn hired Go Intermodal to transport a load of delicatessen meats (the "Deli Meat Load") with three delivery stops. The first delivery stop was scheduled for November 4th at 2:00 p.m. The second delivery was scheduled for November 7th at 11:00 a.m. The third delivery stop was for November 8th at 6:00 a.m. Rate Confirmation 0421593 for the Deli Meat Load is attached as Exhibit 15.

100.  Within a day of Go Intermodal taking possession of the Grocery, Cranberry and Deli Meat Loads, on November 5, 2021, Scotlynn received emails from Jeff Araguren and Natali Reiner stating that Scotlynn's account was past due. As a result, they stated that all freight, including the Grocery, Cranberry and Deli Meat Loads would be held until the past due balance (the money for the setoff) was paid, and the freight charges for the Grocery, Cranberry and Deli Meat Loads in its possession were paid in full. The total amount demanded was $41,584.98.

101.  Scotlynn's counsel called Jeff Araguren, Go Intermodal's purported Operations Manager, to discuss the terms of the payment and to obtain confirmation that if Scotlynn paid the ransom, then the Grocery,

Cranberry and Deli Meat Loads would be delivered on time to their respective destinations.

102. Scotlynn's counsel followed up with the following email to confirm the details of the conversation:

> Please allow this to confirm what you refused to put in writing, which is that your company is now holding the 3 loads that are on the road hostage unless Scotlynn USA Division, Inc. pays all amounts that are claimed due by the various HUB entities. From the excel spreadsheet that was sent by Natali Reiner, that amount is $41,584.98. Please confirm. It is critical for on line[sic] delivery to Scotlynn USA Division, Inc.'s customers.

103. Scotlynn's counsel spoke with Jeff Araguren after sending the above e-mail. During that call, Jeff Araguren stated that, although Scotlynn was told by Go Intermodal that one of the trucks broke down and would result in a late delivery, that was not true. And confirmed the details of this conversation with another email stating:

> **Thank you for confirming that the representation to Scotlynn USA Division, Inc. that a truck is broken down is false**...Please look into who within Freight Hub may have told Scotlynn that one of the three trucks that are en route was broken down, please allow this to further confirm that you will no longer communicate with me or with Scotlynn USA Division, Inc. unless in writing. (emphasis added)

104. Natali Reiner again emailed demanding Scotlynn pay $41,584.98.

105. Scotlynn's counsel responded stating that confirmation was needed from Jeff Araguren that "upon payment, all 3 loads will be delivered <u>on</u>

time and that none of the trucks are broken down."

106.   Jeff Araguren confirmed via email that all trucks were enroute to their destinations and that cargo would be delivered as soon as Ocean Bank confirmed receipt of payment.

107.   Scotlynn asked Jeff Araguren to confirm that Scotlynn's payment of the requested amount would satisfy Go Intermodal, who is identified as the carrier on the rate confirmations, and that Go Intermodal would not then pursue payment from Scotlynn for the balance. Jeff Araguren confirmed this information via email at approximately 3:40 p.m.

108.   The wire transfer instructions and Notice of Assignment provided to Scotlynn by Go Intermodal did not identify it as one of the Go Hub Group Entities holding an account at Ocean Bank.

109.   Thus, at 3:59 p.m., Scotlynn asked Go Intermodal to confirm that that Go Intermodal factors its invoices with Ocean Bank and that payment would be properly applied to amounts claimed by Go Intermodal.

110.   Natali Reiner and Jeff Araguren confirmed that Ocean Bank factors invoices for Go Intermodal.

111.   At approximately 4:20 p.m. on Friday, November 5, 2021, Scotlynn emailed proof that it wired a total of $41,271.00 to Assetco Freight's account with Ocean Bank in exchange for the on-time delivery of the loads. The $41,271.00 wire consisted of the following:

a.      $21,921.00 to Logistics Hub Group for the four loads transported between September 1 and 14 described in ¶67 ;

b.      Go Intermodal – $2,600.00 for the Grocery Load;

c.      Go Intermodal – $10,000.00 for the Cranberry Load; and

d.      Go Intermodal - $7,000.00 for the Deli Meat Load.

112.    On Friday, November 5, 2021, at 5:25 p.m., Jeff Araguren sent an e-mail stating that Scotlynn's payments were short $313.98.

113.    Scotlynn responded by stating that it would wire the remaining balance on Monday.

114.    On Monday, November 8, 2021, at 9:00 a.m., Natali Reiner emailed Scotlynn requesting confirmation of payment of the $313.98.

115.    Scotlynn's attorney replied to Natali Reiner's email stating that the Go Hub Group Entities needed to withdraw their bond claim and provide proof of doing so that day.

116.    Scotlynn also replied to Natali Reiner's email with a breakdown of the invoices and amounts that were requested for payment. These numbers add up to $41,271.00. Scotlynn then asked Natali Reiner if she could say what the additional $313.98 was for.

117.    Natali Reiner stated that $250.00 was a layover fee on load number 0394479, and $63.98 was a lumper receipt on Cranberry Load.

118.    According to the notes on load no. 0394479, the driver took a 36-

hour reset causing him to miss the scheduled delivery appointment which resulted in the $250.00 layover fee. Scotlynn requested additional information about this layover including whether there was anything from the account manager confirming there should be a layover.

119.   Scotlynn then pointed out that the Cranberry Load had not yet been delivered.

120.   On Tuesday, November 9, 2021, Scotlynn learned that Go Intermodal missed the delivery appointment for the Grocery Load, and that the new appointment was for the following Monday, November 15. Although its own actions caused the missed delivery appointment, Go Intermodal informed Scotlynn that it would unload the Grocery Load at a storage facility.

121.   Scotlynn alerted its counsel to the fact that the Grocery Load was the load that the Go Hub Group Entities misrepresented to Scotlynn that the truck had broken down and that was the reason for the rescheduling.

122.   Scotlynn further clarified this information by stating, via email, that the original delivery appointment was November 5 at 2:00 a.m. At 12:47 a.m., an email was received stating that the truck carrying the Grocery Load had broken down. A new delivery appointment was set for November 15 at 2:00 a.m. However, the receiver had an appointment available on November 13 at 11:30 p.m. so Scotlynn reset the delivery for that date and time.

123.   This same morning, Eduardo Aleman aka Ed Ashcroft, the

dispatcher for the Deli Meat Load, called Scotlynn requesting a Comcheck for all 3 lumpers.

124. A Scotlynn employee relayed this request via email to both upper management at Scotlynn, and the Go Hub Group Entities, as the carrier packet completed by the Go Hub Group Entities had selected that no Comchecks were to be issued.

125. Scotlynn requested approval for the Comcheck to be issued

...for the final delivery appt & the other 2 stops as well. [Scotlynn] will need copies of all lumper receipts before the payment for the lumpers can be released.

126. Jeff Araguren replied with two receipts, stating that the lumper fee amounts were $101.00, $171.00, and $230.00. The receipts attached to this email were for $171.00 and $101.00. Jeff Araguren stated that upon Scotlynn's payment to the Go Hub Group Entities, that they would then provide the final receipt as well.

127. At 9:39 a.m. on November 9, 2021, Scotlynn confirmed authorization to issue a Comcheck in the amount of $502 for the lumpers associated with the Deli Meat Load.

128. At approximately 9:45 a.m. on November 9, 2021, counsel for Scotlynn received a phone call from Jeff Araguren regarding the Dry Grocery Load. Jeff Araguren stated that this load was going to be dropped at a warehouse facility but would not identify what warehouse facility. He further

stated that the Dry Grocery Load was intentionally withheld from delivery on its original due date in order to gain leverage to secure payment from Scotlynn for amounts that it disputed owing to other Go Hub Group Entities.

129.    At approximately 11:20 a.m., Scotlynn was notified that the driver of the Dry Grocery Load broke the seal and offloaded the cargo into a warehouse. Go Intermodal demanded payment of additional $230.00 for storage and refused to disclose the location or condition of the Dry Grocery Load until receipt of payment from Scotlynn.

130.    At approximately 11:45 a.m., Jeff Araguren sent out an email stating:

> Regarding load 0415533 [Dry Grocery Load] As per my conversation with Ms. Esquivel, this load is being dropped at the warehouse right now. They are requesting $230 to store and you have 1 week to pick up the load before they add on more charges, so you can send another truck next week to pick it up and make on time delivery of the new appointment. Please send a Comcheck for $$230[sic] to pay for this and we will send you the address to where the freight is right after we finish unloading.

131.    At 12:22 p.m. Scotlynn still did not know the location or condition of the Dry Grocery Load.

132.    At 1:44 p.m., Jeff Araguren emailed the receipt for storage attached as Exhibit 16 to Scotlynn, stating "As soon as you send the Comcheck for this, we will send you location".

133.    While the situation related to Go Intermodal unloading and

concealment of the location of the Dry Grocery Load was unfolding, at 10:45 a.m. that same morning, dispatcher Eduardo Aleman (acting as Ed Ashcroft) demanded payment of an additional $85.00 lumper fee associated with 2 pallets left on the truck when the Deli Meat Load was unloaded.

134.   At 11:03 a.m., Eduardo Aleman (acting as Ed Hankerson) emailed photos of documents for the Deli Meat Load to support [Ed Ashcroft's] statement that there was an additional fee related to the 2 pallets left in the truck.

135.   At 11:24 a.m., Scotlynn emailed Ed Hankerson about the Deli Meat Load asking him to "…have the driver sit tight. The customer is working on to get the receiver to take it in." Scotlynn sent another update at 1:50 p.m. stating that it was still waiting on customer instructions.

136.   At approximately 3:20 p.m., Jeff Araguren called Scotlynn and stated that if he was not told within the hour what to do with the two remaining pallets, he was going to dump them. He further stated that if Scotlynn did not wire the $230 for storage fees for the Dry Grocery Load, then he would dump that load as well.

137.   Jeff Araguren also contacted Scotlynn and stated that the address of the warehouse containing the loads would not be sent until Scotlynn wired the $230 for the storage fees for offloading the Dry Grocery Load.

138.   At 3:31 p.m., Jeff Araguren sent an email clarifying that the Dry

Grocery Load was already delivered to a warehouse, and that Go Hub Group was waiting on the $230 payment.

139.   At 3:52 p.m., Scotlynn instructed Go Intermodal to return to the warehouse and to offload the 2 pallets left of the Deli Meat Load.

140.   At 3:59 p.m., Jeff Araguren emailed Scotlynn stating that there was an $85 lumper fee for unloading the two pallets from the Deli Meat Load. Scotlynn asked Jeff Araguren for to confirm that they were charging an additional $85 to unload the two pallets and Jeff Araguren confirmed.

141.   At 4:15 p.m., Scotlynn sent the Comcheck sequence number via email for the $85 lumper fee for Deli Meat Load.

142.   Scotlynn then authorized payment of the $230 storage fee for the Grocery Load, and Jeff Araguren promptly replied via email with the Comcheck code.

143.   At 4:32 p.m. Eduardo Aleman (acting as Ed Hankerson) sent an email containing the following information: "Biagi Bros. 5001 SW 36th St. Oklahoma City, OK 73179."

144.   On Tuesday, November 16, 2021, the Dry Grocery Load, the last of the hostage loads, was delivered after being left at a warehouse Oklahoma.

145.   As a result of Go Intermodal's failure to deliver on time and as instructed, Scotlynn was damaged by incurring an additional $750.00 expense to hire a new carrier to pick up and deliver this load.

146.   Scotlynn has not received at least two signed BOLs as of this date.

147.   On the morning of November 19, 2021, Scotlynn received an update that Logistics Hub Group reported to Scotlynn's bond company that it had been paid in full and the company closed the file.

### Count I -  Federal Civil Violation of RICO
*(against Luis Lopez, FTL Hub, Logistics Hub, Natali Reiner, Jeff Araguren, and Assetco Freight)*

148.   Scotlynn re-alleges paragraphs 1 through 147 as though fully set forth herein.

149.   18 U.S.C. §1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …."

150.   **Persons**.  Luis Lopez, FTL Hub, Logistics Hub, Natali Reiner, Jeff Araguren, and Assetco Freight (collectively the "RICO Defendants") are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. §1961(3).

151.   **The Enterprise**.  The RICO Defendants, other Defendants, and upon information and belief, other individuals and entities, constitute an "association-in-fact" enterprise (the "Go Hub Group Enterprise") within the meaning of 18 U.S.C. §§1961(3) and 1962(c), and operated the enterprise

continuously for more than one year, with the common purpose of perpetrating racketeering activity, including but not limited to: (a) violation of the Hobbs Act (18 U.S.C. §1951(a)); (b) violation of the Florida Communications Fraud Act (Fla. Stat., §817.034); (c) wire fraud; (d) the transportation of stolen money or property in violation of 18 U.S.C. §2314; (e) violation of the Travel Act (18 U.S.C. §1952); and (f) theft from interstate shipment in violation of 18 U.S.C. §659.

152.   **Interstate Commerce**.   The Go Hub Group Enterprise has engaged in, and their activities affected, interstate commerce.

153.   **Pattern of Racketeering Activity**.   The RICO Defendants, each of whom are persons associated with, or employ by, the Go Hub Group Enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the Go Hub Group Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c).   The racketeering activity was made possible by the RICO Defendants' regular and repeated use of the facilities and services of the Go Hub Group Enterprise.   The RICO Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

154.   The RICO Defendants each committed at least two predicate acts of racketeering activity that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. §1961(1), as more specifically alleged herein.

155.    The acts of racketeering were not isolated, but rather the acts of the RICO Defendants were related in that they had the same or similar purpose and result, participants, victims and methods of commission.  Further, the acts of racketeering by the RICO Defendants have been continuous and have continued over a substantial period of time.

156.    **Predicate Act: Hobbs Act (18 U.S.C. §1951)**.  RICO predicates include 18 U.S.C. §1951, which defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  The RICO Defendants violated this offense when they misrepresented their affiliation with the Go Hub Group Entities, obtained Scotlynn's Egg, Pork, Grocery, Cranberry and Deli Meat Loads through fraudulent means and/or then held the same for ransom.

157.    **Predicate Act: Theft from an Interstate Shipment (18 U.S.C. §659)**.  RICO predicates include 18 U.S.C. §659, which deems guilty of a felony "[w]hoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any … motortruck, trailer, or other vehicle … or from any intermodal container, trailer … with intent to convert to his own use any goods or chattels moving as or which are part of or which constitute an interstate or foreign shipment of freight, express, or other property…."  The RICO Defendants violated this offense when they

misrepresented their affiliation with the Go Hub Group Entities, obtained Scotlynn's Egg, Pork, Grocery, Cranberry and Deli Meat Loads through fraudulent means and/or then held the same for ransom.

158.    **Predicate Act**: **Florida Communications Fraud Act (Fla. Stat., §817.034)**.  RICO predicates include Fla. Stat., §817.034, which deems guilty of a felony anyone "who engages in a scheme to defraud and obtains property thereby…"  The RICO Defendants violated this offense when they misrepresented their affiliation with the Go Hub Group Entities, obtained Scotlynn's Egg, Pork, Grocery, Cranberry and Deli Meat Loads through fraudulent means and/or then held the same for ransom.

159.    **Predicate Act**: **Transportation of Stolen Money or Property (18 U.S.C. §2314)**.  RICO predicates include 18 U.S.C. §2314, which deems guilty of a felony anyone who "transports, transmits, or transfers in interstate or foreign commerce any goods …, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud," or "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, … or to be transported in interstate … commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more…."  The RICO Defendants violated this offense when they

misrepresented their affiliation with the Go Hub Group Entities, obtained Scotlynn's Egg, Pork, Grocery, Cranberry and Deli Meat Loads through fraudulent means and/or then held the same for ransom.

160.    **Predicate Act**: **Travel Act (18 U.S.C. §1952)**.  RICO predicates include 18 U.S.C. §1952, which deems guilty of a felony anyone who travels in interstate commerce or uses the mail system, with intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."  The RICO Defendants violated this offense when they misrepresented their affiliation with the Go Hub Group Entities, obtained Scotlynn's Egg, Pork, Grocery, Cranberry and Deli Meat Loads through fraudulent means and/or then held the same for ransom.

161.    **Predicate Act**: **Wire Fraud (18 U.S.C. §1343)**.  RICO predicates include wire fraud, which deems guilty of a felony anyone who intentionally participates in a scheme to defraud another of money or property and uses the wires in furtherance of that scheme.  The RICO Defendants violated this offense when they misrepresented their affiliation with the Go Hub Group Entities, obtained Scotlynn's Egg, Pork, Grocery, Cranberry and Deli Meat Loads through fraudulent means and/or then held the same for ransom.

162.    **Continuity of Conduct (Close-Ended)**.  The RICO Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Scotlynn, constitute a continuous course of conduct

spanning a period from at least December 2019 to November 2021, which was intended to obtain money through the above-mentioned predicate acts, and other improper and unlawful means.  Therefore, said violations were part of a pattern of racketeering activity under 18 U.S.C. §1961(1) and (5).

163.    **Continuity of Conduct (Open-Ended)**.  The RICO Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Scotlynn, constitute a continuous course of conduct spanning a period from at least December 2019 to November 2021, which was intended to obtain money through the above-mentioned predicate acts, and other improper and unlawful means.  Moreover, as seen from the continuous course of conduct involving the Go Hub Group Enterprise, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future.   Therefore, said violations were part of a pattern of racketeering activity under 18 U.S.C. §1961(1) and (5).

164.    **Conduct of Affairs**.   The RICO Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the Go Hub Group Enterprise through a pattern of racketeering activity as alleged above in violation of 18 U.S.C. §1962(c).

165.    **Proximate Cause and Damages to Business and Property**. The unlawful actions of the RICO Defendants, and each of them, have directly, illegally and proximately caused and continue to cause injuries to the Scotlynn

in its business or property.

WHEREFORE, Scotlynn respectfully requests this Court enter judgment against the RICO Defendants for all damages authorized by law, including all damages actually sustained (trebled as authorized by law), attorneys' fees, costs, and such other and further relief as this Court deems just and proper.

## Count II - Conspiracy to Commit RICO Pursuant to 18 U.S.C. §1962(d) *(against the RICO Defendants, Freight Hub, LTL Hub, and Go Intermodal)*

166. Scotlynn re-alleges paragraphs 1 through 165 as though fully set forth herein.

167. As detailed in Count I above, which Scotlynn adopts and re-alleges herein, the RICO Defendants committed certain predicate acts giving rise to a claim for RICO.

168. The RICO Defendants, Freight Hub, LTL Hub, and Go Intermodal, amongst others, were associated with the Go Hub Group Enterprise, and agreed and conspired to violate 18 U.S.C. §1962(c) by agreeing to the overall objective of the conspiracy; to wit, misrepresenting or concealing the Go Hub Group Entities affiliations with one another in an attempt to misrepresent their affiliation with the Go Hub Group Entities, obtain Scotlynn's Egg, Pork, Grocery, Cranberry and Deli Meat Loads through fraudulent means and/or then hold the same for ransom.

169. The RICO Defendants, Freight Hub, LTL Hub, and Go Intermodal's agreement to the overall objective of the conspiracy can be inferred from the conduct summarized in paragraphs 1 through 167 above to further the conspiracy, including but not limited to, each of their active roles in the conspiracy.

170. Alternatively, and/or additionally, each RICO Defendant was associated with the enterprise described above and agreed and conspired to violate 18 U.S.C. §1962(c) by agreeing to commit at least two of the above alleged predicate acts.

171. As a direct and proximate result of the conspiracy to commit RICO, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), Scotlynn has been damaged in its business or property.

WHEREFORE, Scotlynn respectfully requests this Court enter judgment against the RICO Defendants for all damages authorized by law, including all damages actually sustained (trebled as authorized by law), attorneys' fees, costs, and such other and further relief as this Court deems just and proper.

## Count III - Aiding and Abetting a Violation of RICO Section 1962(c) *(against all Defendants)*

172. Scotlynn re-alleges paragraphs 1 through 171 above as though fully set forth herein.

Page 38 of 48

173.   Defendants aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. §1962(c), specifically, a scheme that: (a) used fraudulent concealment to mislead Scotlynn to believe that Scotlynn was entering into agreements with parties unrelated to the Go Hub Entities and/or Luis Lopez; (b) obtain Scotlynn's loads through fraudulent means; and (c) hold Scotlynn's loads for ransom.

174.   Defendants each had knowledge of the scheme and provided substantial assistance toward its commission.

175.   As a direct and proximate result of Defendants' aiding and abetting of predicate acts of a Section 1962(c) RICO violation, Scotlynn has suffered damages.

WHEREFORE, Scotlynn respectfully requests this Court enter judgment against the RICO Defendants for all damages authorized by law, including all damages actually sustained (trebled as authorized by law), attorneys' fees, costs, and such other and further relief as this Court deems just and proper.

### Count IV - Violation of Florida's Deceptive and Unfair Trade Practices Act Fla. Stat. §501.202(1)
### *(against LTL Hub, Logistics Hub, Go Intermodal, and Luis Lopez)*

176.   Scotlynn re-alleges paragraphs 1 through 147 as though fully set forth herein.

177.   FDUTPA makes unlawful "unfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

178.   Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

179.   Scotlynn is a "consumer" under FDUTPA, which protects, among other entities, "an individual … business; firm; association; joint venture; partnership … corporation; any commercial entity, however denominated; or any other group or combination."

180.   The FDUTPA Defendants (defined below) are involved in trade and commerce in the State of Florida.

181.   A violation of FDUTPA may be based upon a violation of "any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."  Fla. Stat., 501.203(3)(c).

182.   Defendants, LTL Hub, Logistics Hub, Go Intermodal, and Luis Lopez (the "FDUTPA Defendants") violated FDUTPA, by knowingly making statements of fact regarding details of their carrier operations in order to gain contractual agreements with Scotlynn.

183.   The FDUTPA Defendants all represented to Scotlynn that they

were motor carriers authorized to carry the loads brokered to them, that they would transport these loads, and that they would abide by the terms of the contracts they signed.

184. Plaintiff Scotlynn would not have entered into the LTL Hub Contract, Logistics Hub Contract, or the Go Intermodal Contract if it had known that the FDUTPA Defendants were affiliated with and/or one in the same as the Go Hub Group Entities and Luis Lopez.

185. Further, Scotlynn would not have brokered loads to LTL Hub if it had known that LTL Hub did not have the legal authorization to transport the loads brokered to it.

186. The FDUTPA Defendants knew Scotlynn was relying on the information reflected in the contracts signed with each respective entity/party.

187. The FDUTPA Defendants were aware that Scotlynn believed that the FDUTPA Defendants were all carriers that would be transporting the loads brokered by Scotlynn and were not affiliated with and/or one in the same as the Go Hub Group Entities.

188. Scotlynn, relied to its detriment, on the information provided in the signed contracts between itself and the FDUTPA Defendants.

189. As a direct and proximate result of the deceptive and unfair trade practices of the FDUTPA Defendants, Scotlynn suffered actual damages.

WHEREFORE, Scotlynn respectfully requests that this Court enter a

judgment against LTL Hub, Logistics Hub, Go Intermodal, and Luis Lopez for all damages, interest, costs, and attorneys' fees incurred in connection with the violations of FDUTPA, and for all other and further relief as this Court deems just and proper.

## Count V - Indemnification
### *(against Freight Hub d/b/a Dray Hub)*

190.   Scotlynn re-alleges paragraphs 1 through 147 as though fully set forth herein.

191.   Pursuant to Paragraph 12(d) of the Freight Hub Contract, Freight Hub dba Dray Hub agreed to indemnify Scotlynn "from and against any and all liabilities, judgments, fines, claims, lawsuits, penalties, orders, decrees, awards, costs, expenses, including but not limited to attorneys' fees, settlements and claims on account of …   Carrier's breach of any of its representations, warranties and/or covenants in this Agreement."

192.   Freight Hub dba Dray Hub has breached its obligation by refusing to indemnify Scotlynn in connection with the loss for the damaged White Claw.

WHEREFORE, Scotlynn respectfully requests that this Court enter a judgment against Freight Hub and Dray Hub indemnifying Scotlynn for all damages, interest, costs, and attorneys' fees incurred in connection with the damages Scotlynn incurred as a result of the damaged White Claw, and for all other and further relief as this Court deems just and proper.

## Count VI - Fraudulent Concealment
### *(against LTL Hub)*

193.   Scotlynn re-alleges paragraphs 1 through 147 as though fully set forth herein.

194.   LTL Hub and Scotlynn entered into the LTL Hub Contract.

195.   The LTL Hub Contract was entered into after Scotlynn had informed Freight Hub that it was exercising its right to setoff the balance due for the White Claw.

196.   LTL Hub concealed or failed to disclose a material fact; namely, its affiliation with the other Go Hub Group Entities and Luis Lopez.

197.   LTL Hub knew or should have known that this material fact should have been disclosed and had a duty to disclose the material fact.

198.   LTL Hub knew its concealment or failure to disclose this material fact would induce Scotlynn to enter into the agreement with LTL Hub, which in turn would allow LTL Hub to gain access to loads brokered by Scotlynn to use as leverage to recover the balance Scotlynn was withholding from Freight Hub.

199.   Scotlynn brokered three loads to LTL Hub, unaware of its affiliation with Freight Hub. Scotlynn expected that LTL Hub would pick up and transport the three loads brokered to it.

200.   However, LTL Hub allowed FTL Hub to take possession of the

three loads brokered to it. LTL Hub and/or FTL Hub then held these loads hostage until Scotlynn wired the money being withheld for the setoff as well as prepayment for the three loads in its possession.

201.   LTL Hub knew, or should have known, that it was inducing Scotlynn into a contract that it otherwise would not have entered into had it known of LTL Hub's affiliation with the Go Hub Group Entities or Luis Lopez.

202.   LTL Hub had a duty to disclose these material facts to Scotlynn.

203.   LTL Hub knew that its concealment or failure to disclose these material facts would induce Scotlynn into this contractual relationship, causing Scotlynn damages, including but not limited to, layover fees, late fees, storage, and the cost of replacement motor carriers.

204.   Scotlynn detrimentally relied on the misinformation.

WHEREFORE, Scotlynn respectfully requests that the Court enter judgment in its favor and against LTL Hub for compensatory damages, taxable costs, pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

## Count VII - Fraudulent Concealment
### *(against Logistics Hub )*

205.   Scotlynn re-alleges paragraphs 1 through 147 as though fully set forth herein.

206.   Logistics Hub and Scotlynn entered into the Logistics Hub

Contract.

207.   The Logistics Hub Contract was entered into after: (a) the issues with the White Claw load; and (b) the issues with the Pork and Egg Loads.

208.   Logistics Hub concealed or failed to disclose a material fact; namely, its affiliation with the other Go Hub Group Entities and Luis Lopez.

209.   Logistics Hub knew, or should have known, that had Scotlynn been aware of Logistic Hub's affiliation with Luis Lopez or the Go Hub Group Entities it would not have entered into any contract with Logistics Hub.

210.   Logistics Hub knew its concealment of or failure to disclose this material fact (i.e., its affiliation with the Go Hub Group Entities) would induce Scotlynn to enter into the contract.

211.   Logistics Hub had a duty to disclose this material fact to Scotlynn.

212.   Scotlynn detrimentally relied on the misinformation.

213.   As a direct result of Logistic Hub's fraudulent concealment, Scotlynn suffered damages.

WHEREFORE, Scotlynn respectfully requests that the Court enter judgment in its favor and against Logistics Hub for compensatory damages, taxable costs, pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

### Count VIII - Fraudulent Concealment
*(against Go Intermodal)*

214.    Scotlynn re-alleges paragraphs 1 through 147 as though fully set forth herein.

215.    Go Intermodal and Scotlynn entered into the Go Intermodal Contract.

216.    The Go Intermodal Contract was entered into after Scotlynn had informed Logistics Hub that it was exercising its right to set off the balance due for the White Claw.

217.    Go Intermodal knew, or should have known, that Scotlynn would be unaware of Go Intermodal's affiliation with Logistics Hub, Luis Lopez, and the Go Hub Group Entities, and concealed or failed to disclose this material fact.

218.    Go Intermodal knew or should have known that this material fact should have been disclosed and had a duty to disclose the material fact.

219.    Go Intermodal knew its concealment or failure to disclose this material fact would induce Scotlynn to enter into the agreement with Go Intermodal, which in turn would allow Go Intermodal to gain access to loads brokered by Scotlynn to use as leverage to recover the balance Scotlynn was withholding from Logistics Hub.

220.    Scotlynn brokered three loads to Go Intermodal, unaware of its affiliation with Logistics Hub. Scotlynn expected that Go Intermodal would pick up and transport the three loads brokered to it.

221.   However, Go Intermodal allowed FTL Hub to take possession of the three loads brokered to it. FTL Hub then held these loads hostage until Scotlynn wired the money being withheld for the setoff as well as prepayment for the three loads in its possession.

222.   Go Intermodal knew, or should have known, that it was inducing Scotlynn into a contract that it otherwise would not have entered into had it known of Go Intermodal's affiliation with the Go Hub Group Entities or Luis Lopez.

223.   By inducing Scotlynn into this contractual relationship, Go Intermodal caused Scotlynn damages in the form of the $21,921.00 being withheld as setoff, as well as layover fees, late fees, storage, and the cost of replacement motor carriers.

224.   Scotlynn detrimentally relied on the misinformation.

WHEREFORE, Scotlynn respectfully requests that the Court enter judgment in its favor and against Go Intermodal for compensatory damages, taxable costs, pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

### Count IX - Damages Pursuant to 49 U.S.C. §14706
### *(against FTL Hub)*

225.   Scotlynn re-alleges paragraphs 1 through 147 as though fully set forth herein.

226.   As a motor carrier under 49 U.S.C. §14706, FTL Hub is liable to Scotlynn for its full, actual, damages, as asserted herein.

227.   The White Claw was delivered to FTL Hub in good condition.

228.   The White Claw arrived at its destination frozen; thus, in bad condition.

229.   Scotlynn sustained damages as a result.

WHEREFORE, Scotlynn respectfully requests that the Court enter judgment in its favor and against FTL Hub for all damages Scotlynn sustained as a result of the damaged White Claw, taxable costs, pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

Respectfully submitted on Tuesday, March 01, 2022.

| **PADULA BENNARDO LEVINE, LLP** | **ESQUIVEL LAW, CHARTERED** |
|---|---|
| /s/ Joshua S. Widlansky | /s/ Katy Koestner Esquivel |
| Joshua S. Widlansky | Katy Koestner Esquivel |
| Florida Bar No. 45197 | Florida Bar No. 0159484 |
| 3837 NW Boca Raton Boulevard | Moorings Professional Building |
| Suite 200 | 2335 Tamiami Trail North |
| Boca Raton, Florida 33431 | Suite 301 |
| Main: 561.544.8900 | Naples, Florida 34103-4457 |
| Facsimile: 561.544.8999 | Telephone : (239)206-3731 |
| JSW@PBL-Law.com | Facsimile : (239)431-3942 |
| *Attorneys for Plaintiff Scotlynn USA Division* | kke@esquivel-law.com |
| | service@esquivel-law.com |
| | *Attorneys for Plaintiff Scotlynn USA Division* |