



**EXHIBIT 12**

# Carrier Form

*Please fill out and sign the following forms to better enable us to update your company profile.*

Carrier Name: INTERMODAL REFRIGERATED SERVICES   Owner's Name: JEFF BANKERSON

Dispatchers: ADRIAN DUNNING   Claims Contact (Name, #) 305-781-2640

Remit to/Mailing Address: 4604 49 STREET N SUITE 1401

City: ST PETERSBURG   State: FL   Zip: 33709

Physical Address (If Different): _____

City: _____   State: _____   Zip: _____

Phone: (Local) 305-781-2640   (Fax) _____

(Cell) _____ (After Hours: Name,#) _____

Email: PLANNER3@INTERMODALREEFER.COM   MC# 1281321   DOT# 3682288

Number of Trailers/Power Units: (Reefers) 1   (Vans) ___   (Flatbeds) ___   (Power Units) ___

Do you have brokerage authority? ( ◯ YES or ⦿ NO ) - If Yes, please provide letter of authority.

PAYMENT OPTIONS; Circle One: **Factored:** ⦿ Yes or ◯ NO ) - If Yes, please attach NOA. - If No, See next line.

( **ACH Direct Deposit:** ( ◯ YES or ⦿ NO )   **Payment Speed:** ( ⦿ REGULAR PAY   or ◯ QUICK PAY )

## **COMCHECK AUTHORIZATION**

*Comchecks are available **only** after freight has been loaded. There is a **3% fee** for comchecks issued for fuel advances and quickpay. At Scotlynn we offer a **40% maximum** fuel advance **up to $2,500.***

TO RECEIVE COMCHECKS, CHECK OFF ALL BOXES THAT APPLY.

| Comcheck Authorization | Drivers | Dispatchers | Neither |
|---|---|---|---|
| Unloading/Lumper Fees | ☐ | ☐ | ✔ |
| Fuel Advances | ☐ | ☐ | ✔ |
| QuickPay | ☐ | ☐ | ✔ |

At Scotlynn, we have after-hours dispatchers that are here 24/7/365 to address any problems or concerns you may have. We can be reached anytime at 888-263-1888.

Carrier Signature: ADRIAN DUNNING   Digitally signed by ADRIAN DUNNING Date: 2021.11.03 09:35:03 -04'00'   Date: 11/3/21

-2-

Carrier Initials AD



## PROPERTY BROKER/ CARRIER AGREEMENT

This Agreement is made this <u>3</u> day of <u>NOVEMBER 2021</u>, 20__, by and between Scotlynn USA Division, Inc., a Florida corporation (hereinafter called "Property Broker" and/or "Broker"), and <u>INTERMODAL REFRIGERATED SERVICES</u>, whose business address is <u>4604 49 ST N SUITE 1401, ST PETERSBURG FL 33709</u> (hereinafter called "Carrier").

WHEREAS, Broker has been issued a property broker license by the Federal Motor Carrier Safety Administration ("FMCSA") and plans to arrange for the transportation of shipments for various shippers.

WHEREAS, Carrier is engaged in business as a motor contract carrier, and has been issued an operating authority by the FMCSA (or its predecessor, the Interstate Commerce Commission ("ICC")), which authorizes Carrier to provide transportation service for the shipments tendered to it by Broker.

NOW, THEREFORE, in consideration of the mutual promises and other valuable considerations, the parties agree as follows:

1.      Carrier warrants that it holds contract motor permit operating authority issued by the FMCSA or the ICC in MC-<u>1281321</u>, which authorizes the transportation of commodities on behalf of Broker or Broker's customers.

2.      Carrier warrants that it is a duly certificated motor carrier pursuant to the standards and regulations of FMCSA or ICC, and Carrier warrants that FMCSA or ICC has authorized Carrier as fit to operate on the roadways of the North American Continent and has not placed Carrier out of service or designated Carrier as "Unsatisfactory" or restricted Carrier's authorization to operate in any manner whatsoever that would render Carrier unable or unauthorized to perform under the terms of this Agreement.  Carrier shall immediately notify Broker of any change in Carrier's standing rendering it "Unsatisfactory" or otherwise unable or unauthorized to perform under the terms of this Agreement.

3.      Broker warrants that it is licensed as a property broker to arrange for the transportation of property in MC-710411.

4.      Carrier shall receive from Broker such quantity of goods on behalf of Broker as may be tendered for transportation from time to time, and Carrier shall make all reasonable efforts to have the required equipment available to transport said shipments.  Carrier warrants that its equipment is maintained in good order, and is suitable for the transportation of the shipments tendered to it. Carrier shall transport and carry said goods without delay caused by anything within Carrier's control.  In the event a shipment is rejected, in part or in whole, by the consignee, the Carrier shall immediately contact Broker and shall immediately follow Broker's instructions as to where to transport and/or otherwise dispose of the goods.  The same mileage rate shall apply from the consignee destination to the new location as directed by Broker.

5.      With respect to transportation services provided herein, Carrier shall comply with all federal, state and local laws, including, but not limited to, laws governing the safe operation of commercial vehicles, employment laws, etc.  As an independent contractor, as set forth in Paragraphs 12 and 15, Carrier agrees to defend, indemnify and hold harmless Broker and its customers, shippers, consignors and/or consignees (hereinafter "Broker's Customers") from and against all fines, penalties and liabilities resulting from Carrier's failure to comply with such laws, rules, regulations and ordinances.  Broker hereby disclaims any and all carrier duties, and by, executing this Agreement, Carrier expressly accepts and affirms said disclaimer.

6.      Carrier agrees to carry such goods at the rates and charges as set forth in Broker's "***Schedule A***" and/or "***Load and Rate Confirmation***," which shall be signed by Carrier and transmitted by Carrier to Broker by facsimile (or other electronic means) for each shipment accepted by Carrier under this Agreement.  Carrier and Broker agree that any common carrier tariff rates, accessorial charges, rules and regulations do not apply, in any fashion, to any shipment tendered under this Agreement.  Any change in rates, charges or rules and regulations hereunder shall be mutually agreed to and confirmed in writing, signed by both parties.  Carrier also agrees that any detention, loading, unloading, lumper, layover accessional, turnpike fees, tolls, maintenance, and/or, any other expenses shall not be paid by Broker without its prior written approval.

7.      Carrier shall sign a bill of lading or other form of receipt acceptable to Broker when it picks up the shipment.  By signing such documents, Carrier represents that it is the properly licensed motor carrier that is assuming the legal obligation to transport the tendered shipment. To the extent any terms of the bill of lading or receipt are inconsistent with the terms of this Agreement, the terms of this Agreement shall govern. Every shipment tendered to Carrier shall be deemed to be tendered to Carrier as a motor contract carrier and shall be subject only to the terms of this Agreement and the provisions of law applicable to motor contract carriage, unless otherwise expressly stated herein.  Statutory provisions and regulations which are waivable under 49 U.S.C. § 14101(b) and related sections, and which are inconsistent with the terms of this Agreement, are hereby expressly waived; the terms of this Agreement shall govern.

8.      Carrier shall ensure that Broker's name is not listed as the "carrier" on the bill of lading.  Acceptance of the goods by Carrier shall mean that Carrier immediately and effectively assumes full liability for such goods, until proper delivery is made to the consignee.  Where trailers are spotted for the consignor's or consignee's convenience at point of origin and/or destination, Carrier's full liability begins when the trailer is picked up by Carrier and terminates when the trailer is spotted for delivery and the consignee is notified.   The bill of lading/receipt shall be prima facie evidence of the actual receipt by Carrier of such goods in good order and condition, unless otherwise expressly noted on the face of such document.  All such documents shall show the actual consignor and consignee.

**Carrier Initials** <u>AD</u>

9.       Carrier agrees to invoice Broker and only Broker.  Carrier agrees not to invoice any of Broker's Customers (including, but not limited to, the shipper, consignee and consignor) for shipments tendered under this Agreement.  Carrier agrees that Broker has the exclusive right to handle all billing of freight charges to Broker's Customers (including, but not limited to, the shipper, consignee and consignor) for the transportation services provided herein, and, as such, Carrier expressly agrees to refrain from all collection efforts against Broker's Customers (including, but not limited to, the shipper, receiver, consignor, and consignee), unless advance authorization is given in writing by Broker.  Broker agrees to pay Carrier for the transportation of shipments under this Agreement in accordance with the rates described in Paragraph 6 above, within thirty (30) days of receipt of Carrier's invoice and signed delivery document covering such transportation; provided, however, Carrier agrees that said invoice shall not be paid until Broker has received payment from the Shipper for the shipment in question.  Carrier invoices not submitted to Broker within sixty (60) days of shipment as specified on the applicable bill of lading are waived.  Further, Carrier hereby waives all claims for freight charges against any party (including, but not limited to, Broker, Broker's Customers, the shipper, the consignee and the consignor) if a lawsuit is not filed and served within nine (9) months of shipment as specified on the appropriate bill of lading.  Actions of the Carrier (such as unreasonable delay, shortage, loss, etc.) which result in non-payment or delay in payment to Broker by Shipper, shall, likewise, affect (including delay and/or set-off) final settlement to the Carrier.

Further, compensation paid under this Agreement may be withheld, in whole or in part, by Broker to satisfy this obligation.  Broker reserves the right to deduct an amount equal to the loss, damage, or spoilage on any shipment as a result of the negligence or alleged negligence on the part of the Carrier, its contractors, agents, servants or employees for the same or any other shipment; provided, however, that Broker shall furnish to Carrier a written explanation and itemization of all deductions computed at the time deductions are made.  Carrier shall not withhold any goods of any Customer on account of any dispute as to rates or any alleged failure to receive payment of freight charges incurred under this Agreement.  Carrier further agrees that Broker has the discretionary right to offset any payments owed to Carrier hereunder for liability incurred under this Agreement.

10.      Carrier shall maintain, at its own cost at all times during the term of this Agreement, the following insurance policies:

a.       Commercial Automobile Liability Insurance policy for primary liability insurance in an amount not less than One Million Dollars ($1,000,000.00) or such higher insurance coverage as may be required by law, which policy shall provide coverage for public liability, property damage, environmental restoration, and injury or death to persons resulting from the performance of transportation service under this Agreement.  Such insurance shall be primary and not contributory to any coverage available to Broker or Broker's Customers.

b.       Commercial General Liability Insurance, including contractual liability and protective liability coverage (consistent with the indemnity obligation herein) in a combined single limit of not less than One Million Dollars ($1,000,000.00) per occurrence.

c.       Motor Truck Cargo Liability Insurance insuring Carrier against liability for loss or damage to cargo and commodities while in the custody, possession or control of Carrier in an amount not less than One Hundred Thousand Dollars ($100,000.00) or such higher insurance coverage as may be required by law or by Broker from time to time.

d.       Refrigeration Breakdown Insurance insuring Carrier against liability for loss or damage to cargo and commodities while in the custody, possession or control of Carrier due to mechanical or electrical breakdown or malfunction of temperature control system, in an amount not less than One Hundred Thousand Dollars ($100,000.00) or such higher insurance coverage as may be required by law or by Broker from time to time.

These insurance policies providing coverage shall be written by a reputable insurance company.  These policies shall also provide that the insurance company issuing such policies shall notify both the Carrier and Broker of its intention to cancel any policy at least ten (10) days prior to the effective date of cancellation.  Carrier shall furnish, at Broker's request, a Certificate or Certificates of Insurance designating Broker as Certificate Holder.  The aforementioned insurance requirements are minimum requirements and shall not limit Carrier's liability to Broker in any manner.

Carrier, upon reasonable demand, shall deliver to Broker copies of its ICC Operating Authority and Certificate of Insurance, insuring Carrier's liability for personal injury, property damage, loss or damage to cargo, and refrigeration breakdown.  Upon request of Broker, Carrier shall have its insurance amended to include insurance of Broker as its interests may appear.

11.      Carrier shall be responsible for the proper care and handling of freight moving under this Agreement, and shall be liable to Broker and Broker's Customers for the full actual loss, damage, or injury to property occurring while in the custody, possession or under the control of Carrier, its employees, or its contractors and agents.  For purposes of this Agreement, the term "full actual loss" shall mean the value of the cargo as determined by Shipper.

Except as otherwise provided herein, Carrier shall be liable for cargo loss and damage in accordance with federal law (49 U.S.C. §14706) with respect to all shipments.  Except as otherwise provided herein, cargo claims shall be filed in accordance with 49 C.F.R. 370.  If loss or damage does occur, Broker's client(s), or Broker on behalf of such client(s), shall submit a claim in writing to Carrier, within nine (9) months of delivery date, or scheduled delivery date, whichever is later.  A claim shall not be invalidated if the exact amount of the claim is not quantified within nine (9) months.  Carrier shall acknowledge receipt of claim in writing within thirty (30) days of receiving such claim, and Carrier shall resolve (pay in full, partial payment, or decline payment for just cause) such claim within one hundred twenty (120) days of filing date.  Failure on the part of the Carrier to comply with this specific provision, to wit: the thirty (30) day response deadline, shall constitute a waiver of Carrier's defenses to the cargo claim and any associated lawsuit by both Broker and Broker's Customers.

-4-

**AD**

**Carrier Initials** _____

12.     Carrier shall defend, indemnify and hold harmless Broker and Broker's Customers from and against any and all liabilities, judgments, fines, claims, lawsuits, penalties, orders, decrees, awards, costs, expenses, including but not limited to attorneys' fees, settlements and claims on account of any of the following:

a.      Loss or damage to property (other than cargo), or personal injury, including, but not limited to, death, which may be sustained by the parties, their employees or third parties, arising out of or in connection with Carrier's performance of any of the services set forth herein;

b.      Loss or damage to property (other than cargo), or personal injury, including, but not limited to, death, which may be sustained by the parties, their employees or third parties, arising out of or in connection with Broker's performance of any of the services set forth herein, including, but not limited to, Broker's own negligence or willful, reckless or wanton conduct;

c.      Loss, damage or delay in transit as to all goods which Carrier receives for transport under this Agreement (to wit: cargo), until Carrier delivers such goods and the same are signed for and accepted by the consignee;

d.      Carrier's breach of any of its representations, warranties and/or covenants in this Agreement; or

e.      Carrier's failure to comply with worker's compensation requirements or any claim for worker's compensation asserted against Broker or Broker's Customers by Carrier's employees or their personal representatives.

This provision will not be construed in any circumstance to constitute an indemnification contrary to any government law that prohibits indemnification against loss, liability, costs or expenses incident thereto caused by the negligence of such indemnity.

13.     Carrier acknowledges that its position as carrier for Broker gives it access to special knowledge of Broker and Broker's Customers, organization and business methods ("Business Information") which could be harmful to Broker if used for any purpose other than the promotion of Broker's business as provided in this Agreement.  Carrier agrees that, during the term of this Agreement, and for a period of three (3) years from the date of termination of this Agreement, Carrier will not communicate with Broker's Customers or disclose to any third party any of the Business Information it may have gained through its relationship with Broker.  Carrier agrees that, in the event of any breach of the covenants contained in this paragraph, Broker will be entitled to, in addition to any other rights and remedies, an injunction or restraining order restraining Carrier from committing or continuing to commit any breach of these provisions, and Carrier hereby consents to the issuance of such injunction or restraining order or other equitable relief without bond or other security and without the necessity of actual damage to Broker.

14.     Carrier agrees that, during the term of this Agreement and for a period of three (3) years from the date of termination of this Agreement, that neither Carrier nor any employee, officer, director, contractor, agent or otherwise of Carrier, shall directly or indirectly solicit traffic from any shipper, consignor, consignee, or customer of the Broker where (a) the availability of such shipments first became known to Carrier as a result of Broker's efforts; or (b) the shipments of the consignor, consignee, or customer of the Broker was first tendered to the Carrier by the Broker.

In the event Carrier violates the terms of this Paragraph and back-solicits Broker's Customers and obtains traffic from such customers, Broker is then entitled, for a period of thirty-six (36) months after the traffic first begins to move, to a commission from the Carrier of fifteen percent (15%) of the transportation or revenue received on the movement of traffic.  Carrier understands and agrees that the provisions of the aforementioned covenant not to compete are reasonable as to scope, duration, and geographic area, in light of the mutual promises and other valuable consideration the parties have agreed to in this Agreement.  Further, Carrier agrees that any violation of the covenant not to compete will cause irreparable injury to Broker, and that Broker will be entitled to a restraining order and an injunction to stop the back-solicitation of traffic.

15.     The relationship of Carrier to Broker shall, at all times, be that of independent contractor.  Carrier shall and does assume full responsibility for all state and federal taxes, assessments, costs and fees arising out of the transportation of goods required herein.  Carrier, at its sole cost and expense, shall furnish all equipment required for its services hereunder and shall maintain all equipment in good repair and condition.  Carrier, at is sole cost and expense, shall employ for its services hereunder only competent and legally licensed personnel.

16.     Without the prior written consent of Broker, Carrier shall not cause or permit any shipment tendered hereunder to be transported by any other motor carrier or in substituted service by railroad or other modes of transportation.  Further, Carrier does not have the right to assign, allocate broker, forward, or tender the shipment to a third party or subcontractor.  Carrier does not have the right in any way to negate, eliminate, circumvent or alleviate Carrier's liability to Broker or Broker's Customers.  Carrier shall be responsible for all liabilities incident to the transportation service rendered by Carrier under this Agreement.

17.     Carrier agrees that it will not intentionally delay, retain, seize or assume control of a product or shipment subject to this Agreement, whether as a lien for the payment of freight charges or otherwise.

18.     No waiver, alteration or modification of any of the provisions of this Agreement, or any of the Appendices referred to herein, will be binding upon either party unless in writing, signed by an appropriate representative of both parties.

19.     This Agreement may not be assigned or transferred, in whole or in part, and supersedes all other agreements and all tariffs, rates, classifications and schedules published, filed or otherwise maintained by Carrier.  This Agreement shall be binding upon and inure to the benefit of the parties hereto.

-5-

**AD**

**Carrier Initials** _____

20.     If any provision of this Agreement is held invalid or unenforceable under any law, rule or regulation, such provision shall be reformed or deleted, but only to the extent necessary to comply with such law, rule or regulation, and the remaining provisions of this Agreement will remain in full force and effect.

21.     This Agreement, together with any Appendices hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior oral or written representations and agreements.

22.     The parties hereby stipulate to the exclusive jurisdiction of the courts situated in Lee County, Florida, over any litigation between the parties arising hereunder, except that the case may be removed to the appropriate federal court in the Middle District of Florida.  Carrier shall pay all costs, expenses and attorney fees which may be expended or incurred by Broker or Broker's Customers in enforcing this Agreement or any provision thereof, including but not limited to Paragraph 12 above, or in exercising any right or remedy of Broker or Broker's Customers against Carrier, or in any litigation incurred by Broker because of any act or omission of Carrier under this Agreement.  For all purposes herein, Broker shall have the sole, exclusive right to choose its counsel and the sole, exclusive right to determine if that counsel's fees and costs are reasonable.

23.     The failure of either party at any time to require performance by the other party of any provision of this Agreement will in no way affect the right to require such performance at any time thereafter, nor will waiver of either party of a breach of any provision of this Agreement constitute a waiver of any succeeding breach of same or any other provision.

24.     This Agreement shall be for a period of one (1) year from the date of execution hereof and shall automatically renew for additional one (1) year periods, unless canceled by either party by thirty (30) days written notice to the other.

25.     This Agreement is to be construed according to federal law governing transportation and the laws of the State of Florida.  If any part of this Agreement is determined to be contrary to law, such determination shall not affect the validity of any other terms or conditions.

26.     Carrier also declares that the undersigned has fully read this Agreement, that the undersigned has had an opportunity to consult with legal counsel before signing this Agreement, that the undersigned fully understands the terms contained herein, and that the undersigned freely, voluntarily and knowingly accepts the consideration and terms contained herein, and in particular, the attorney fees provision in paragraph 22, for the purpose of making this Agreement.

27.     Carrier acknowledges that the goods tendered to it in accordance with ¶4 may consist of food for humans or animals as defined in §201(f) of the Federal Food, Drug, and Cosmetic Act ("Food Shipments"). Carrier warrants that it is and shall remain in compliance with the laws and regulations governing the safe and secure transportation of food, including those required by local, provincial, state and federal laws, regulations, ordinances and rules including, but not limited to, the Food Safety Modernization Act (21 U.S.C. §2201, *et. seq.*) ("FSMA"), the Federal Food, Drug and Cosmetic Act (21 U.S.C. §341, *et seq.*) ("FD&C Act"), the Sanitary Food Transportation Act (49 U.S.C. §5701, *et seq.*), the U.S. Food and Drug Administration's Final Rule on the Sanitary Transportation of Human and Animal Food (21 C.F.R. §1.900, *et seq.*) and all applicable U.S. Department of Agriculture and Food Safety and Inspection Service regulations (collectively, the "Food Safety Laws"). Carrier warrants that it maintains written procedures related to the safe transport of Food Shipments tendered to it by Broker, and trains its drivers and staff regarding safe transport of any Food Shipments and other goods.

Carrier warrants and assumes full liability and responsibility for the sanitary transport of food transported by it. Carrier shall comply with the written instructions of the Broker or of Broker's customer, including without limitation any temperature set point or temperature range, as provided to Carrier in physical or electronic form. If the instructions require a cargo seal, the absence of a seal or any seal irregularities (such as evidence of tampering) shall be sufficient to consider the shipment unsafe or "adulterated" as defined in ¶31 below.

Carrier shall verify the temperature of Food Shipments before loading. Carrier shall write the recorded temperature on any and all shipping document(s) related to the pick-up, transport, or delivery of Food Shipments, including without limitation any Bill of Lading ("Shipping Document"). In the event that: (a) Carrier is unable to verify the temperature due to restrictions imposed by the Broker, consignor, consignee or due to the physical circumstances of loading; and (b) Carrier has provided written notice of such inability to the Broker immediately

Carrier's Initials following discovery of such circumstances; then Carrier shall be excused from performing such temperature verification. The foregoing exception shall not relieve Carrier of compliance with any other provision of this Agreement.

Carrier represents and warrants that all Equipment (as defined in the Food Safety Laws) used in transporting Food Shipments is and shall be in safe and sanitary condition and appropriate for transportation of Food Shipments, including but not limited to ensuring that the Equipment is free from contamination, pest infestation, or evidence of prior cargo that could render the Food Shipments unsafe or adulterated. If Carrier transports partial load shipments (also known as less-than truckload, or LTL, shipments), Carrier shall conduct appropriate inspections and take necessary actions upon receiving the first shipment and each subsequent shipment to ensure that (a) the Equipment remains in safe and sanitary condition; (b) any Food Shipments will not be contaminated by any previously or subsequently loaded cargo; and (c) the temperature of any temperature-controlled Food Shipment will not be materially disrupted. When required by and as specified in the instructions of the Broker or of Broker's customer, or in any Shipping Document, Carrier shall ensure that the cold storage compartments are prepared for safely transporting the Food Shipments. Carrier shall set temperature controls to pre-cool mechanically refrigerated cold storage compartments before offering equipment with auxiliary refrigeration units for transportation of Food Shipments requiring temperature control and shall set the operating temperature to ensure the Food Shipments are, at all times, maintained at the temperature set point or within the temperature range specified on the instructions of the Broker or of Broker's customer or in any Shipping Document. Carrier acknowledges and agrees that its compliance with all temperature-related instructions related to each Food Shipment is a material term of this Agreement.

**Carrier Initials** AD _____

28. Carrier shall maintain all documentation and records related to the transport of Food Shipments governed by this Agreement, including those documenting personnel training, Equipment cleanings, sanitization and inspections, and the safe and sanitary transport of Food Shipments, including but not limited to: A. Evidence of the operating temperature of Food Shipments maintained during transport; B. Written policies, procedures and processes for maintaining food safety, including maintenance of temperature control, and cleaning, sanitizing, and inspecting Equipment; C. Evidence of transportation traceability, including information regarding previous cargo hauled in bulk or in other Equipment, as well as maintenance and intervening cleaning procedures for docks and Equipment; D. Appropriate training processes for each person under Carrier's supervision or control involved in providing the transportation services rendered by it in accordance with this Agreement; and E. Evidence that the Food Shipments have not been rendered unsafe or been "adulterated" (as defined in ¶31 below) and have been transported under sanitary conditions protected from any physical, chemical, or microbial contamination, temperature abuse and excessive temperature fluctuations.

Upon the written request of the Broker, Carrier shall produce such documentation and records to Broker immediately or as promptly as practicable thereafter.

29. Carrier agrees that any failure to transport a Food Shipment in complete compliance with this Agreement and the written instructions and requirements set forth in the Shipping Document (including any seal, temperature, quality control standards and delivery date requirements) shall result in such Food Shipment being considered unsafe and "adulterated" within the meaning of the FD&C Act (21 U.S.C. §§342(a)(i)(4), 342(i)). Carrier acknowledges and understands that adulterated shipments may be refused by the Broker, consignee or receiver upon their tender for delivery at destination, with or without inspection. Carrier bears sole and exclusive liability for its failure to comply with any of the requirements, covenants or obligations set forth in this Agreement. The Broker has exclusive discretion to determine the acceptability, salvageability and/or the adulterated status of Food Shipments transported by Carrier, and such determination shall be binding on Carrier. Broker is not responsible for and shall not be liable to Carrier for the failure of Carrier, the consignee, receiver or loader to adhere to their respective obligations under the laws and regulations governing the safe and sanitary transport of food for human consumption, including the Food Safety Laws referenced above.

30.     CARRIER HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY OF ANY CLAIM AGAINST BROKER RELATED TO TRANSPORTATION SERVICES OR ARISING FROM THIS AGREEMENT.

CAUTION!  READ BEFORE SIGNING!

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representative as of the day and year first written above.

**Broker Name:**  Scotlynn USA Division, Inc.

**Carrier Name:**  INTERMODAL REFRIGERATED SERVICES

**Signature:**

**Agent:** Ryan Carter

**Title:** Executive Vice President

**Date:** November 5, 2019

**Signature:** ADRIAN DUNNING  Digitally signed by ADRIAN DUNNING Date: 2021.11.03 09:37:31 -04'00'

**Agent:** ADRIAN DUNNING

**Title:** LOGISTICS SPECIALIST

**Date:** 11/3/21

-7-

**Carrier Initials** AD



*(For Refrigerated Loads)*

### *Notice of Requirement to Comply with:*

California Air Resources Board's (ARB) Transport Refrigeration Unit (TRU or Reefer)
Airborne Toxic Control Measure (ATCM)

Scotlynn USA requires all carriers to comply with the regulations of the California Air Resources Board's Transportation Unit Airborne Toxic Control Measure.

As a carrier supplying transportation services to Scotlynn USA, you must certify the only reefers which comply with ARB's TRU ATCM in-use performance standard will be dispatched.

If you are a California based carrier, you are required to be registered on the ARBER system. If you are based outside of California, and have not registered with the ARBER system, we strongly recommend that you do so, in order to avoid any potential rejections and/or delays in loading.

Please be advised that effective on or before January 1, 2013 our bill of lading will contain the following statement, which is your further certification of compliance:

_____

*Carrier certifies that the TRU equipment furnished for loading*
*this shipment is in compliance with California TRU Regulations.*

_____

Your driver's signature on the bill of lading is an acknowledgement of the above statement, and certification that the equipment being offered for loading by Scotlynn USA is in compliance.

Please sign and return a copy of this letter certifying your organizations acceptance to:

Scotlynn USA
15671 San Carlos Blvd. Suite 102
Fort Myers, FL 33908

INTERMODAL REGRIGERATED SERVICES          ADRIAN DUNNING          11/3/21
_____    _____    _____
Carrier Name                        Authorized Representative             Date

-8-                                                                    AD
                                                        **Carrier Initials** _____